1  JODI LINKER
   Federal Public Defender
2  Northern District of California
   CANDIS MITCHELL
3  Assistant Federal Public Defender
   19th Floor Federal Building - Box 36106
4  450 Golden Gate Avenue
   San Francisco, CA 94102
5  Telephone:  (415) 436-7700
   Facsimile:  (415) 436-7706
6  Email:      Candis_Mitchell@fd.org
7
8  Counsel for Defendant Richars
9
10                 IN THE UNITED STATES DISTRICT COURT
11                FOR THE NORTHERN DISTRICT OF CALIFORNIA
12                         SAN FRANCISCO DIVISION
13

| | |
|---|---|
| 14  **United States of America,** | **Case No.:** CR 21–206 CRB |
| 15  Plaintiff, | **Defendant's Sentencing Memorandum** |
| 16  v. | |
| 17  **Nicholas Richars,** | **Court:** Courtroom 6, 17th Floor |
|   | **Hearing Date:** July 29, 2022 |
| 18  Defendant. | **Hearing Time:** 12:30 p.m. |

INTRODUCTION

Repentant and thoughtful about his conduct and the steps he can take to rectify his actions, Nicholas Richars, through undersigned counsel, respectfully discusses the applicable statutory sentencing factors supporting a sentence of 60 months' custody, 10 years' supervised release, $100 special assessment, and $5,000 restitution.

THE APPLICABLE 3553(A) FACTORS

1. **The nature and circumstances of the offense and the history and characteristics of the defendant;**

Born and raised in the Modesto, Mr. Richars is the son of Merrily Kay and Melvin Richars.[1] He resides with his mother, a retired teacher.[2] As a child, he was active in his community and with his family. As he describes his youth in his letter to the Court:

> I have memories of a loving family growing up. I attended Centenary United Methodist Church in Modesto, participating in youth groups, volunteering for church functions, and singing in youth, and, later, adult choirs. I have a younger sister, Heather, who too was involved in the church, and with whom I have a loving relationship to this day. We both were leaders in our schools, among our peers, and at the church camp we both attended every summer.[3]

Mr. Richars' bucolic family life was interrupted after he was sexually abused by a peer and again when his parents separated and later divorced after his mother's infidelity.[4] The depression that developed after his abuse and his parents' divorce affected him academically. Though intellectually gifted, he struggled at school and attended only a few college courses at Modesto Junior College.[5] His depressive state manifested in him not being motivated to do his work and instead just "exist" while he was at school.

Despite struggling in school, Mr. Richars hit his stride when he started working at a local restaurant after he graduated from high school. He needed a job and had frequented restaurants a lot with his father and thought that if he would work, he might as well do it in a place he would enjoy. He

---

[1] PSR ¶ 65.
[2] *See* Exhibit C (Letter from Merrily Kay).
[3] Exhibit A (Letter from Nicholas Richars).
[4] *See* Exhibit A (Letter from Nicholas Richars).
[5] *See* Exhibit A (Letter from Nicholas Richars).

DEFENDANT'S SENTENCING MEMORANDUM
*RICHARS*, CR 21–206 CRB

1

writes:

> My father, who had worked hard to provide for us for many years was out of work. I needed to help. I began working at a local restaurant. I had never had a job before, and my work ethic lacked direction. Rather than move on from me, the owner decided to double-down his efforts with me, and I was mentored into a managerial role in a fine dining restaurant while I was still eighteen years old. I fell in love with hospitality. I quickly became the most knowledgeable member of the staff regarding beverage. I had a passion for wine, one that I continue to follow to this day. I lead that restaurant to multiple awards for its wine program, and soon moved to another restaurant to continue my autodidactic journey toward absorbing all I could about hospitality.[6]

Mr. Richars has thrived in the hospitality field, and those who have worked with him consider him thoughtful, a hard worker, and committed to his craft.[7]

Mr. Richars' arrest stemmed from unhealthy sexual behavior he began after his abuse and his parents' divorce. When he was younger, he communicated with his peers over the internet and using the phone in an overtly sexual nature to distract him from his depressive feelings. As he describes it, "[i]t was at that time that I began using self-gratification as a coping mechanism. I began using online interactions, phone sex, and pornography as part of that gratification."[8] His unhealthy use of online and remote interactions would ebb and flow as he would have healthy relationships with age-appropriate women. However, he would return to his familiar coping mechanism of the internet and self-gratification through with online sexual encounters when he experienced depression. He would meet people on message boards and apps and start a conversation and progress the conversation to a sexually charged conversation. With those encounters he was indiscriminate with who he reached out to and interacted with large swaths of women—some of whom were underage.[9] Ultimately, his interests are not particularized to underaged women and instead, his therapist qualified him as having a generalized additive behaviors related to having sexual conversations with anyone who would engage.[10] He has had no intention to meet any of the women he spoke with in real life.

---

[6] Exhibit A (Letter from Nicholas Richars).
[7] *See* Exhibit G, I, and J.
[8] Exhibit A (Letter from Nicholas Richars).
[9] *See* Exhibit A (Letter from Nicholas Richars).
[10] Exhibit B (Letter from Isabel Van Sicklen, LMFT).

While having conversations, Mr. Richars engaged with women of all ages, including minors, using a communication application known as Snapchat. Those minors sent him sexually explicit videos and photographs. Those photographs and videos were the conduct that Mr. Richars admitted to in pleading guilty to receipt of child pornography. Reflecting on his actions, Mr. Richars writes that his of his motivation for his actions in his letter to the Court:

> I continued to use self-gratification as a form of coping, largely in the form of online sexual encounters. These encounters included many women over time, some of them being underage. I knew it was wrong, yet I chose to persist. I knew it took from others and took from myself, with nothing in return. I knew it, but I hadn't fully realized it. I was not truly whole. There was a part of me that I chose to ignore; a part that I kept secret from myself and others. In many ways it did not seem real, but it was. I didn't look at this part of me. Carl Jung would call this part the shadow self. The part of ourselves we keep hidden. It was the part of me that held shame, guilt, fear, and abandonment. I wish I had looked at this part of me and cared for it before a spotlight was shone on it for the world to see - before that part of me hurt others. In not caring for myself, I hurt others. That may be the hardest part of all of this, causing others pain.[11]

Before and after his arrest, Mr. Richars has availed himself of therapy to provide him with better coping mechanisms than the self-destructive ones that lead to his arrest. Though his work with his therapist his is clearly remorseful with for his actions and realizes the harm he has caused others. He writes of his reflection and understanding of the consequences in his letter to the Court:

> I will pay a great price for what I have done. I will miss a lot of time with those I love. I may not be able to lay my father to rest – he recently passed. I miss him. I have hurt so many, so much. Never again will I allow myself to so blatantly hurt others. Never again will I be so blind to myself. Never again will I take what I have as granted. I will continue working to be an example worth emulating, and not an example of the worst. I will once again be a leader, and someone that those close to me can be proud of. I owe that much to those I have harmed, to the community, to the court, and to my loved ones.[12]

---

[11] Exhibit A (Letter from Nicholas Richars).
[12] Exhibit A (Letter from Nicholas Richars).

DEFENDANT'S SENTENCING MEMORANDUM
*RICHARS*, CR 21–206 CRB

3

2. **The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to punish the offense; The need for the sentence imposed to afford adequate deterrence to criminal conduct; The need for the sentence imposed to protect the public from further crimes of the defendant;**

Mr. Richars does not diminish the seriousness of his misconduct. Receipt of child pornography is undeniably a grave offense warranting the significant punishment Mr. Richars has and will receive. Mr. Richars is acutely aware that he committed a real crime, with real victims.

But 60-months imprisonment as a total sentence is sufficient. The longest sentence Mr. Richars received was two days in jail for Driving Under the Influence.[13] The recommended sentence is a substantial sentence for Mr. Richars, especially when considering the long-term collateral consequences associated with his conviction, such as registration as a sex offender. Because of his conviction, Mr. Richars will have continuing restrictions on his liberty—including restrictions on where he may live and work long after he leaves custody.

Most important, Mr. Richars does not require additional time in custody to prevent future reoccurrences. Mr. Richars has proactively begun treatment and concluded that he is unlikely to reoffend again. As Dr. Van Sicklen writes in her treatment summary:

> The most important question before the court has to do with the likelihood that Nicholas Richars will reoffend. Based on both my work with Nick as well as research on different groupings of sexual offenders, my conclusion is that he will not. A primary distinction is made in the research literature between contact sexual offenders (people who engage in actual physical contact with minors) and internet sexual offenders. The latter group is distinctly different from the former, with a significantly lower occurrence of reoffending.[14]

Dr. Van Sicklen found no proclivities in Mr. Richars that would suggest that he is prone to repeat his offense of receipt of child pornography, nor to have actual sexual contact with under-aged individuals. The recidivism rates for child pornography offenses are remarkably low; and Dr. Van Sicklen concluded that the adjudication of these offenses is deterrent enough for all but the most hardened, driven pedophile, which Mr. Richars is not. In addition, Dr. Van Sicklen is heartened by

---

[13] PSR ¶ 56.
[14] Exhibit B (Letter from Isabel Van Sicklen, LMFT).

DEFENDANT'S SENTENCING MEMORANDUM
*RICHARS*, CR 21–206 CRB

4

Mr. Richars' ability to engage in both self-reflection and empathy for those that he has harmed. She concludes her treatment summary by noting:

> He has experienced the self-inflicted humiliation of watching his blossoming career collapse just as it was gaining momentum. He has been forced to return to a parent's home. All the while he has been in regular psychotherapy fully examining and at times, reliving childhood traumas and difficulties. He is fully aware that he is responsible for all that has happened to him. As a result, he has deeper and more authentic relationships, far greater maturity, and greatly enhanced self-awareness. Because he used these months very constructively, he is not at risk for reoffending.[15]

Dr. Van Sicklen's observations and Mr. Richars' letter to the Court demonstrate that he understands he deserves punishment for his actions, but that extensive custodial time is unnecessary for the reflection needed to change future behaviors. The Court may be confident that the pain of prison will be secondary to the shame he feels now and will always feel for the actions that brought him to the Court. Mr. Richars' highlights these thoughts in his letter to the Court writing:

> I will carry a burden with me for the rest of my days. I am thankful that I have had such great support from those around me, and professional support as well. I know whatever I face, I can lay down a little of that burden at a time, but that it will never go away. Part of me is thankful it will never go away. A reminder of my wrongs can only help to encourage me to be good. I have lost so much, and, as much as it hurts, I intend to continue working daily to be a better person, a better friend, a better colleague, and a better citizen. I know that this burden will be a reminder of the burdens we all carry and will serve as inspiration to always help those around me.[16]

Last, as evident in Mr. Richars' letter, strong relationships are the most effective deterrent to future criminality. Research shows that "when prison sentences are relatively short, offenders are more likely to maintain their ties to family, employers, and their community, all of which promote successful reentry into society. Conversely, when prisoners serve longer sentences, they are more likely to become institutionalized, lose pro-social contacts in the community, and become removed from legitimate opportunities, all of which promote recidivism."[17] Mr. Richars' friends and family

---

[15] Exhibit B (Letter from Isabel Van Sicklen, LMFT).
[16] Exhibit A (Letter from Nicholas Richars).
[17] Valerie Wright, Ph.D., The Sentencing Project - Deterrence in Criminal Justice: Evaluating Certainty v. Severity of Punishment (November 2010) citing Thomas Orsagh and Jong-Rong Chen,

have demonstrated that they will stand up for him to provide him with a supportive community. See Exhibits C-J. A 60-month sentence permits Mr. Richars to remain hopeful and aware of those who have stood by him throughout his incarceration. A longer sentence, by contrast, risks reinforcing the isolation, hopelessness, and self-doubt that plagued him before and would prevent successful reintegration into society should it return unabated.

**3. The need for the sentence imposed to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;**

Ultimately, Mr. Richars' treatment needs are focused on treatment of his mental health. As a young adolescent, Mr. Richars was sexually abused by an older peer.[18] The sexual abuse he suffered when he was younger provides some explanation for his actions regarding self-gratification, online interactions, phone sex, and pornography.[19] Mr. Richars recognizes that he needs extensive continued mental health treatment. Based on his marked improvement in behavior and insight while going through therapy, one of the best tools available to prevent recidivism would be to continue providing him with sufficient treatment and counselling so he has the tools necessary to address the abused he suffered.

Mr. Richars requires no vocational training, as he has been able to generally maintain steady employment in his primary field of hospitality.[20] Most recently, he capitalized on his knowledge of food and wine to rescue a struggling restaurant and turn it into a thriving business once again.[21] While in custody, Mr. Richars intends to avail himself of educational opportunities available to him to complete some college level courses in business and business management. Once released, he

---

"The Effect of Time Served on Recidivism: An Interdisciplinary Theory," Journal of Quantitative Criminology, 4(2):155-171, 1988.
[18] Exhibit A (Letter from Nicholas Richars).
[19] A number of studies have established the possibility of a link between suffering child sexual abuse and developing deviant sexual thoughts as an adult. *See e.g.* Lipovsky, J. A. & Kilpatrick, D. G. (1992) The child sexual abuse victim as an adult. *The Sexual Abuse of Children* (vol. 2) (eds W. O'Donohue & J. H. Geer), pp. 430-476. Hove and London: Laurence Erlbaum Associates; Salter D et al. 2003. Development of sexually abusive behaviour in sexually victimised males: A longitudinal study. *The Lancet* 361(9356): 471–476.
[20] PSR ¶ 75-77; Exhibit A (Letter from Nicholas Richars).
[21] Exhibit I (Letter from Denise Guntert).

DEFENDANT'S SENTENCING MEMORANDUM
*RICHARS*, CR 21–206 CRB

intends to return to his current place of employment or otherwise continuing working in the hospitality industry.[22]

### 4. The sentences available;

Mr. Richars is charged with Receipt of Child Pornography. He faces a mandatory minimum sentence of five years and a maximum sentence of 20 years' imprisonment. The minimum term of supervised release that can be imposed is five years and there is the possibility of a maximum of lifetime supervised release. There is a mandatory fine of $5000 under the Justice for Victims of Trafficking Act (JVTA) of 2015 unless Mr. Richars is indigent.[23] There is a maximum fine of $250,000 and a special assessment of $100.

### 5. The kinds of sentence and the sentencing range established for the applicable category of offense committed by the applicable category of defendant in the guidelines

#### 5.1. Mr. Richars' Proposed Guideline Calculations

```
Base Offense Level, USSG § 2G2.2 ............................................................... 22
Use of a Computer, USSG § 2G2.2(b)(6) ...................................................... +2
Over 600 images, USSG § 2G2.2(b)(7)(D) .................................................... +5
Acceptance of Responsibility, USSG § 3E1.1(a) & (b) .................................. −3

Total Offense Level ........................................................................................ 26
Criminal History Category .............................................................................. I

Mr. Richars' Recommendation ............................................................ 60 months
Probation's Recommendation ............................................................ 108 months
```

#### 5.2. Mr. Richars' Objections to Probation's 5K Upward Departure

In the PSR, the probation officer recommends a sentence of 108 months based upon a recommendation for an upward departure under U.S.S.G. § 5K2.21 because it is alleged that Mr. Richars asked multiple individuals to produce child pornography.[24] Mr. Richars objects to the proposed sentencing enhancement. Mr. Richars was not charged with the production of child

---

[22] Exhibit I (Letter from Denise Guntert).
[23] *See* 18 U.S.C. § 3014(a).
[24] PSR ¶ 100.

DEFENDANT'S SENTENCING MEMORANDUM
*RICHARS*, CR 21–206 CRB

7

pornography. In advocating for the enhancement, the PSR goes far beyond information admitted by Mr. Richards at his change of plea and instead relies upon untested details provided by the case agent and various investigative reports.[25] The Court cannot solely rely on this hearsay without it being proven by the government. However, even considering the information in the PSR, there is not sufficient reliable evidence to enhance Mr. Richars' sentence to that of the child-pornography production Guidelines.

### 5.2.1. The plea agreement factual basis does not support application of the variance to replicate the production Guideline

Despite arguing for an upward variance, the PSR conceded that "the requirements for relevant conduct to be considered were not met" in determining to cross-reference Mr. Richars' actions with the child pornography production Guidelines.[26] Furthermore, in his plea agreement Mr. Richars did not or otherwise attest the accuracy of all the conduct the PSR asserts justifies the application of the variance.[27]

Mr. Richars admitted that he engaged with minors to ask minors to send sexually explicit images and videos.[28] In doing so, that does not necessarily mean (1) that the sexually explicit images he solicited were of the minors themselves, or, (2) even if they were of the minors he was communicating with, that he persuaded them to engage in sexually explicit conduct to produce the images, rather than just soliciting from them sexually explicit images they had previously produced, for example. Courts have found similar evidence insufficient to prove a defendant induced a minor to produce child pornography.[29]

The offense conduct to which Mr. Richars was receipt of child pornography, the PSR should not implicitly cross-reference the production Guideline (§ 2G2.1) using an upward variance that mimics the applied Guidelines after admitted the evidentiary requirements were not met to explicitly apply the production Guidelines.

---

[25] PSR ¶ 6.
[26] PSR Sentencing Recommendation.
[27] Plea Agreement ¶¶ 1, 2.
[28] Plea Agreement ¶¶ 2.
[29] *United States v. Crooker,* 360 F. Supp. 3d 1095, 1099-11004 (E.D. Wash. 2019); See also *United States v. Broxmeyer*, 616 F.3d 120, 124 (2d Cir. 2010).

**6. Any pertinent policy statement**

Addressed above.

**7. The need to avoid unwarranted sentence disparities among defendants with similar records found guilty of similar conduct**

Sentencing Mr. Richards to a sentence of 60 months will not produce a disparity among similarly situated defendants. The majority of the individuals in Mr. Richars guideline range and Criminal History Category receive a below-guideline sentence.

According to the Judiciary Sentencing Information (JSIN):

> During the last five fiscal years (FY2017-2021), there were 183 offenders whose primary guideline was §2G2.2, with a Final Offense Level of 26 and a Criminal History Category of I, after excluding offenders who received a §5K1.1 substantial assistance departure. For the 174 offenders (95%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 48 month(s) and the median length of imprisonment imposed was 51 month(s). For all 183 offenders in the cell, the average sentence imposed was 46 month(s) and the median sentence imposed was 48 month(s).[30]

**8. The need to provide restitution to any victims of the offense.**

The Mandatory Victims Restitution Act ("MVRA") requires courts to order restitution to victims who are "directly and proximately harmed" by a defendant's offense.[31] The government must prove by a preponderance of the evidence (1) an entity is a victim for restitution purposes and (2) the loss.[32] Although "applying the MVRA can be complex and somewhat burdensome," the statute "requires some precision when calculating restitution. Speculation and rough justice are not permitted."[33] "Where the alleged loss is not quantifiable to any degree of certainty, the government's burden has not been satisfied, and no restitution should be ordered."[34] Only one individual has submitted a request for restitution under the MVRA for $5,000. Mr. Richars has no objection to an

---

[30] United States Sentencing Commission, JSIN Dashboard, accessible at: https://jsin.ussc.gov/analytics/saw.dll?Dashboard
[31] 18 U.S.C. § 3663A(a)(2).
[32] *See United States v. Waknine*, 543 F.3d 546, 556 (9th Cir. 2008).
[33] *United States v. Anderson*, 741 F.3d 938, 954 (9th Cir. 2013).
[34] *Id.* (citing § 3663A(c)(3)(B)).

order for restitution to make payment to the one individual, A.H., who has substantiated a claim for restitution.

**9. Mr. Richars' Objection to Probation's Recommendation for a $25,000 Fine**

Finally, the PSR recommends a $25,000 fine. Mr. Richars' works in the hospitality field and lives with his mother. He has outstanding legal debt for approximately 25,000[35] and has appointed counsel.[36] Mr. Richars is not financially stable enough to cover a 25,000 fine.

Because Mr. Richars is indigent, he does not have to pay a fine of $5000 under the Justice for Victims of Trafficking Act (JVTA). The Act mandates a $5,000 special assessment for "any non-indigent person" convicted of certain offenses, including possession of child pornography.[37] In *United States v. Kelley*, the court determined that "an analysis of both a defendant's current financial situation and his ability to pay in the future is appropriate in determining his 'non-indigent' status."[38] Mr. Richars' current finances and limited ability to earn funds place him in the category of individuals who are unable to pay.[39]

OBJECTION TO PROPOSED SPECIAL CONDITIONS OF SUPERVISED RELEASE

The special conditions of supervised release may be imposed only after the Court can "support its decision to impose the condition on the record with record evidence that the condition of supervised release sought to be imposed [was] necessary to accomplish one or more of the factors listed in § 3583(d)(1) and involve[d] no greater deprivation of liberty than [was] reasonably necessary."[40] Accordingly, Mr. Richars objects to the following proposed special conditions of supervision as not being justified to support a factor in 18 U.S.C. § 3583(d)(1) based upon the offense:
> Proposed Condition 11. You must not possess or use any data encryption technique or program.

---

[35] PSR ¶ 78.
[36] *See* Docket No. 6, Minute Entry.
[37] See 18 U.S.C. § 3014 (mandating assessment for non-indigent person "convicted of an offense under ... chapter 110 (relating to sexual exploitation and other abuse of children)").
[38] 861 F.3d 790, 801 (8th Cir. 2017).
[39] *See* 18 U.S.C. § 3014(a).
[40] *See United States v. Wolf Child*, 699 F.3d 1082, 1090 (9th Cir. 2012) (internal quotation marks omitted) (citing *United States v. Stoterau*, 524 F.3d 900, 1005 (9th Cir. 2008); *United States v. Weber*, 451 F.3d 552, 568 (9th Cir. 2006)).

Security and data privacy are ubiquitous because of the large amount of the prevalence of devices and the large amount of personal data that individuals carry in phones and computers. Many smartphones such as iPhones or Android devices use a passcode to "lock" a phone when it is not in use. Many computers have a similar passcode to lock access to the device. That passcode in certain operating systems and programs automatically operates to encrypt data on the devices. Apple computers and phones have built in default encryption to safeguard user data and to verify that only trusted code and apps run on a device.[41] Encryption is not limited to hardware. Google Cloud encrypts all customer content stored at rest, with no action from the customer, using one or more encryption mechanisms.[42] The majority of in-browser password keepers all use encryption to protect saved passwords used to access websites.

This proposed condition is overbroad because Mr. Richars will not be able to use any modern technology as most operating systems, devices, and programs rely upon data encryption and techniques without user input and without a user being able to disable the systems in effect. The condition should be removed as Probation can achieve its goals of monitoring Mr. Richars' internet activities with implementation of proposed conditions 6, 7, 8, 9 and 10.

CONCLUSION

For first time, non-violent offenders, social science demonstrates that unnecessarily long terms of imprisonment increase the risk of recidivism by damaging a defendant's social ties and is unnecessary to support the goals of punishment. Considering Mr. Richars' lack of priors, the abuse he suffered as a child, and the strong support he has in his community Mr. Richars is asking the Court to fashion his sentence as: 60-months' custody, 10 years of supervised release, no fine, $5,000 restitution under the MVRA to A.H., and a $100 special assessment.

//

---

[41] See https://support.apple.com/guide/security/encryption-and-data-protection-overview-sece3bee0835/web
[42] See https://cloud.google.com/docs/security/encryption/default-encryption

Dated:   July 22, 2022                      Respectfully submitted,

                                            JODI LINKER
                                            Federal Public Defender
                                            Northern District of California

                                                      /S
                                            _____
                                            CANDIS MITCHELL
                                            Assistant Federal Public Defender